IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JONATHAN O. HAFEN, in his capacity as Court-appointed Receiver,<br><br>Plaintiff,<br><br>v.<br><br>KARA BRIMLEY, an individual,<br><br>Defendant. | **ORDER AND MEMORANDUM DECISION GRANTING RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00875-TC<br><br>Judge Tena Campbell |

Before the court is Receiver Jonathan O. Hafen's Motion for Summary Judgment against Defendant Kara Brimley.[1] (ECF No. 15). Having considered the parties' submissions, and based on the undisputed material facts, the Receiver is entitled to judgment as a matter of law as set forth below.

**FACTUAL AND PROCEDURAL BACKGROUND**

On November 13, 2018, the Commodity Futures Trading Commission (CFTC) and the Utah Division of Securities (UDOS) initiated a civil enforcement action against Rust Rare Coin, Inc. (RRC), Gaylen Dean Rust, and related individuals and entities (collectively, the "Receivership Defendants"). Commodity Futures Trading Commission v. Rust Rare Coin, Inc., Civil No. 2:18-cv-00892-TC-DBP, ECF No. 1 (the "Enforcement Action"). The CFTC and UDOS alleged that Receivership Defendants had offered an investment opportunity (the "Silver Pool"), through which Receivership Defendants claimed to generate substantial returns for

---

[1] Kara Brimley is the Defendant's former married name. Her name is now Kara Brinkerhoff. (Brinkerhoff Decl. ¶ 1 (ECF No. 16-2).)

1

investors through the buying and selling of physical silver. Id. The CFTC and UDOS also alleged that the Silver Pool was a Ponzi scheme, not a legitimate investment.

On November 15, 2018, the court appointed Jonathan O. Hafen (the Receiver) as Temporary Receiver for the assets of Receivership Defendants. Enforcement Action, ECF No. 22. On November 27, 2018, the court entered an Order Appointing Receiver and Staying Litigation which continued the Receiver's appointment until further order of the court. Enforcement Action, ECF No. 54. The Receiver was charged with, among other things, investigating the financial and business affairs of Receivership Defendants and recovering all assets of the Receivership estate.

On November 8, 2019, the Receiver began the above-captioned ancillary action, seeking to recover funds transferred to Defendants by Receivership Defendants. Defendant William Brimley was dismissed from the action upon stipulation by the parties (ECF No. 8). On November 16, 2020, the Receiver filed this motion, asking for a determination that Receivership Defendants operated the Silver Pool investment scheme since at least 2008; the Silver Pool operated not as a legitimate investment opportunity, but was instead a Ponzi scheme; Defendant Kara Brimley and her former husband William Brimley were investors in the Silver Pool; and Ms. Brimley received $53,850[2] in distributions from the Silver Pool in excess of the amounts she contributed to the Silver Pool. (Mot. at 1–2 (ECF No. 15).) The Receiver seeks disgorgement back to the Receivership estate of all amounts received in excess of Ms. Brimley's initial principal investment.

---

[2] The Receiver's motion contains what appears to be a typographical error on page 14. The Receiver writes that "the amount Ms. Brimley received in excess of her contributions to the Silver Poll is $58,850, which must be disgorged." (Mot. at 14 (emphasis added).) Elsewhere in the Receiver's same motion, Ms. Brimley's response, the Receiver's reply, and the attached Shaw Declaration, the correct account is listed as $53,850.

As exhibits in support of the Motion, the Receiver submitted declarations from Mr. Hafen ("Hafen Decl.") and Jeffrey T. Shaw ("Shaw Decl."), as well as a report from D. Ray Strong ("Strong Report"). These experts were retained to assist with the investigation and administration of the Receivership estate. Mr. Hafen's declaration incorporated and relied upon the attached Receiver's Report, issued in the Enforcement Action. The Receiver's Report details Mr. Hafen's extensive investigation into the business operations and financial condition of Receivership Defendants and summarizes the key findings of that investigation. Attached to the Receiver's Report are hundreds of pages of exhibits and appendices containing the documents on which Mr. Hafen bases his conclusions.

In response to the Receiver's Motion, Ms. Brimley does not provide evidence to refute the Receiver's factual assertions. She nevertheless opposes the Receiver's Motion, arguing that the Motion "amounts to a collateral attack on a state court judgment, which is not permitted." (Def.'s Response at 19 (ECF No. 16).)

## UNDISPUTED MATERIAL FACTS

### I.  Receivership Defendants' Silver Pool Scheme

Receivership Defendants solicited funds from investors by representing that they would use such funds to trade physical silver, thereby generating returns for investors. (Hafen Decl. ¶ 13; Ex. 1.) Specifically, Receivership Defendants represented that one-half of invested funds would be used to purchase physical silver, which would be stored at Brink's facilities.[3] The remaining one-half of the invested funds would purportedly be used to buy and sell physical

---

[3] Brink's Global Services U.S.A. Inc. ("Brink's") is a large, well-known, and respected private security and protection company that provides armored transportation and highly secured storage services. (Strong Report at 7 n.18)

3

silver on the commodities market, increasing the investor's silver holdings over time and generating returns on the investment. (Hafen Decl. ¶ 13.)

In reality, investor funds were not used to purchase physical silver. (Id. ¶ 14.) Gaylen Rust admitted that new investor funds were used to pay returns to existing investors and to fund other businesses that were unrelated to the Silver Pool. (Id. ¶ 15; see also Strong Report at 13–15.)

Although Receivership Defendants represented that they managed over $80 million of physical silver and that approximately one-half of that amount was stored at Brink's locations in Salt Lake City and Los Angeles, there is no evidence that Receivership Defendants ever stored significant amounts of physical silver at Brink's or any other facility. (Hafen Decl. ¶ 19.) Gaylen Rust admitted that there was no significant amount of silver stored at Brinks at the time of the Receiver's appointment. (Id. ¶ 21.) There is no evidence that Receivership Defendants ever traded significant amounts of physical silver on a regular basis in the manner represented to investors. (Id. ¶ 17(c).)

Since 2008, Receivership Defendants raised at least $225 million from investors and paid out at least $175 million to investors. (Id. ¶ 17(e)-(f).) Even as early as 2008, the net operating income obtained through Receivership Defendants' limited business operations was insufficient to make payments to investors. (See id. ¶ 17(i) (comparing RRC's net-operating income to payments RRC made to investors and other RRC-affiliated businesses); Strong Report at 23–24.) The payments made to investors since 2008 could only have been from funds raised from other investors, as there was no other source of funds from which these payments could have been made. (Hafen Decl. ¶ 17(k); Strong Report at 24, 76.)

From 2008 through the appointment of the Receiver in 2018, Receivership Defendants continued to take in ever-increasing funds from investors and to pay out exorbitant returns. Between January 1, 2018, and November 15, 2018, Receivership Defendants paid more than $37 million to investors. (Strong Report Ex. 25 (summarizing amounts raised from and paid to investors on a year-by-year basis).)

Receivership Defendants told investors that the Silver Pool was "no risk" because the investment was backed by physical silver, which would always have value, and that the Silver Pool paid an average return of 20-25%. (Hafen Decl. ¶ 19.) Receivership Defendants represented that returns between 2012 and 2017 exceeded 40% and, in one year, had exceeded 100%. Investor statements provided by Receivership Defendants reflected that every silver trade was successful and that Receivership Defendants had never lost on a trade. (Id.)

Moreover, Receivership Defendants promoted the Silver Pool as an exclusive program offered only to those investors Rust knew personally. (Id. ¶ 20.) Receivership Defendants falsely claimed to have a trading relationship with HSBC, one of the world's largest banks, and to employ a proprietary trading algorithm that allowed Receivership Defendants to beat the market. (Id. ¶ 22.) Receivership Defendants paid exorbitant returns to investors for years, creating the false impression that profits were being earned, which attracted new investors to the scheme and convinced existing investors to increase their investment. (Id. ¶ 21.)

Investors have likely suffered in excess of $100 million in net principal losses. (Id. ¶ 25.) The assets of Receivership Defendants are grossly inadequate to pay these net principal losses. (Id. ¶ 27.)

**II. Ms. Brimley's Investment in the Silver Pool**

On October 9, 2012, William and Kara Brimley jointly invested $50,000 into the Silver Pool through their company, Brimley Foods LLC. (Shaw Decl. ¶ 12; Ex. 4.) On October 23, 2013, Mr. Brimley received a disbursement of $5,000 from the Silver Pool. (Id. ¶ 13; Ex. 5.) On May 22, 2014, Ms. Brimley received disbursement of $5,000 from the Silver Pool. (Id. ¶ 13; Ex. 6.)

Following these payments, the Brimleys' remaining principal balance was $40,000, although Ms. Brimley asserts that the documents from Receivership Defendants showed the principal balance to be worth considerably more. (Id. ¶ 13; Brinkerhoff Decl. ¶¶ 6–8. (ECF No.16-2).) Ms. Brimley does not remember the exact amount that the supposed RRC account statements showed and she no longer possesses the statements. (Brinkerhoff Decl. ¶¶ 6–7.)

In August 2014, the Brimleys divorced and reached a settlement concerning the division of their assets. Pursuant to the divorce decree, Mr. Brimley was awarded $15,000 from the Brimleys' investment in the Silver Pool and Ms. Brimley was awarded the "remainder of the monies invested with Rust Coin." (Shaw Decl. ¶ 14; Ex. 7.) Mr. Brimley asserts that, if she had not believed she was receiving the supposed profits from the account, she would have pressed for a different divorce settlement. (Brinkerhoff Decl. ¶ 9.)

After deducting the $15,000 awarded to Mr. Brimley, the remaining principal balance of the investment was $25,000. (Shaw Decl. ¶ 15.) From September 2014 through October 2018, Ms. Brimley received or caused to be paid on her behalf nine disbursements totaling $78,850. (Id. ¶ 16; Exs. 8–16.) One payment, disbursed on October 26, 2018, was made to Patriot Diesel at Ms. Brimley's request and instruction. (Id. ¶ 16; Ex. 17.) In total, Ms. Brimley received directly or through payments made on her behalf $53,850 more than what she contributed to the Silver Pool. (Id. ¶ 17.)

**DISCUSSION**

The Receiver asks for a determination that the Silver Pool operated as a Ponzi scheme since at least 2008 and that Ms. Brimley received $53,850 more from the Silver Pool than what she put into the Silver Pool. The Receiver seeks to have that amount returned back to the Receivership Estate as a voidable transfer pursuant to Utah's Uniform Voidable Transactions Act (the "Act"). See UTAH CODE § 25-6-101 et seq.

For the reasons discussed below, the Receiver's Motion is granted in its entirety. The court finds the declarations and reports of Mr. Hafen, Mr. Shaw, and Mr. Strong to be substantial and credible. The evidence conclusively establishes that Receivership Defendants operated a Ponzi scheme since at least 2008, that Receivership Defendants misrepresented the nature of that scheme in order to defraud investors, that Ms. Brimley invested in the scheme, and that Ms. Brimley received payments from the Ponzi scheme in excess of amounts invested.

**I.       Summary Judgment Standard**

Summary judgment is appropriate "when there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law." Lints v. Graco Fluid Handling (A) Inc., 347 F. Supp. 3d 990, 1002 (D. Utah 2018); FED. R. CIV. P. 56(a). In applying this standard, the Court "view[s] the factual record and draw[s] all reasonable inferences therefrom most favorably to the nonmovant." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

**II.      Utah's Uniform Voidable Transactions Act in the Context of Ponzi Schemes**

Under Utah law, a transfer is voidable under the Act "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." UTAH CODE § 25-6-202(1)(a). The Act allows a creditor to obtain "avoidance of the transfer or obligation to the

extent necessary to satisfy the creditor's claim." Id. § 25-6-303(1)(a); see also id. § 25-6-304(2)(a) ("[T]o the extent a transfer is avoidable in an action by a creditor under Subsection 25-6-303(1)(a), . . . the creditor may recover judgment for the value of the asset transferred.").

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments." Jobin v. McKay, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996); accord S.E.C. v. Management Solutions, Inc., No. 2:11-cv-1165-BSJ, 2013 WL 4501088, at *19 (D. Utah Aug. 22, 2013). "In order to show that an investment scheme falls within the definition of a Ponzi scheme, the Receiver must prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors." Management Solutions, 2013 WL 4501088, at *19.[4]

In the context of a Ponzi scheme, courts in this district have stated that "the mere existence of a Ponzi scheme is sufficient to establish a defendant's actual intent to defraud." Klein v. Nelson, No. 2:13-cv-497-TC, 2015 WL 4545748, at *2 (D. Utah July 28, 2015); see also Wing v. Dockstader, 482 F. App'x 361, 363 (10th Cir. 2012) (same); In re Indep. Clearing House, 77 B.R. 843, 860 (D. Utah 1987) ("One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible."). "[A] receiver of an entity which was used to perpetrate a Ponzi scheme

---

[4] Although an investment opportunity qualifies as a Ponzi scheme if newly invested funds are used to pay existing investors, certain other characteristics are also typically found in Ponzi schemes: promises of substantial, consistent returns; representations that the investment involves little or no risk; payment of substantial returns for at least some time as an enticement to attract new investors; and representations that the investment is secret, exclusive, and/or highly complex. Management Solutions, 2013 WL 4501088, at *19. Ponzi schemes are also, by definition, insolvent from the beginning. Id.; Klein v. Cornelius, 786 F.3d 1310, 1320 (10th Cir. 2015) ("Ponzi schemes are insolvent by definition . . . .").

has standing to recover fraudulent transfers as though the receiver were a creditor of the scheme." Dockstader, 482 F. App'x at 363, adopting the reasoning of Scholes v. Lehmann, 56 F.3d 750, 753–55 (7th Cir. 1995).

Once a plaintiff establishes that the debtor operated as a Ponzi scheme, all transfers by the debtor entity are presumptively fraudulent and are subject to avoidance. See Nelson, 2015 WL 4545747, at *2. The recipient of funds from the Ponzi scheme then bears the burden of demonstrating that (1) the funds were received in good faith and (2) in exchange for reasonably equivalent value. See Klein v. King & King & Jones, P.C., No. 2:12-CV-00051, 2013 WL 4498831, at *2 (D. Utah Aug. 19, 2013). "It is well established that an investor in a Ponzi scheme does not exchange reasonably equivalent value for payments which exceed the investor's investments." Miller v. Wulf, 84 F. Supp. 3d 1266, 1274 (D. Utah 2015); see also Donell v. Kowell, 533 F.3d 762, 777 (9th Cir. 2008) (finding that amounts above "the innocent investor's initial outlay . . . are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business," and "[t]hese amounts are not a 'reasonably equivalent' exchange for the defrauded investor's initial outlay").

Accordingly, if the Receiver shows that the Silver Pool operated as a Ponzi scheme, amounts received by investors in excess of their principal investment—i.e., an investor's "profits" from the scheme—are not received in exchange for reasonably equivalent value and must be returned to the Receivership Estate.

### III. The Silver Pool Operated as a Ponzi Scheme Beginning in at Least 2008.

The undisputed evidence in support of the Receiver's Motion establishes that Receivership Defendants operated the Silver Pool as a Ponzi scheme. Since as early as 2008, Receivership Defendants offered a silver investment opportunity in which they solicited

investments by representing that investors' funds would be used to trade physical silver, thereby generating returns for investors. Unfortunately for investors, Mr. Rust's representations were false.

The Receiver's investigation uncovered no evidence that Receivership Defendants had ever traded physical silver in the manner described to investors. Indeed, when questioned by the FBI, Mr. Rust admitted that no significant stores of physical silver existed and that his statements to investors were "all lies." (Receiver's Report Ex. C at 62:10–15; Ex. F at 25:4–11). Critically, Mr. Rust expressly admitted that he used newly invested funds to pay returns to existing investors. The Receiver's investigation also revealed no payments associated with the storage of large quantities of physical silver in Brink's facilities. (Id. at 13 & Ex. G). Millions of dollars of investor funds were diverted to other business entities that were unrelated to any silver trading. (Id. at 13).

It is clear that Receivership Defendants did not trade physical silver in the manner represented to investors. Instead, the evidence presented at summary judgment reveals that Receivership Defendants diverted investor funds to other RRC-affiliated businesses and to pay returns to existing investors. Mr. Rust expressly admitted that he had used newly invested funds to pay returns to existing investors in the Silver Pool. (See Receiver's R. at 15 & Ex. F at 11:8–18; 24:13–18).

In addition to Mr. Rust's admissions, the Receiver's investigation of the books and records of Receivership Defendants revealed no evidence of purchases or sales of silver in amounts that would have been necessary to sustain the Silver Pool and no evidence that Receivership Defendants ever stored the quantities of silver that were represented to investors. (Receiver's Report at 16). Likewise, Mr. Strong's analysis revealed that payments made to

investors could only have been sourced from funds received from other investors and that there was no other source of funds from which these investor payments could have been made.

Finally, in Hafen v. Famulary—another ancillary lawsuit to the Enforcement Action—this court conclusively held that the Silver Pool operated as a Ponzi Scheme beginning in at least 2008. No. 2:19-CV-00627-TC, 2021 WL 229356, at *4–5 (D. Utah Jan. 22, 2021).

### IV.     Ms. Brimley's Investment in the Silver Pool

As described, there is no real dispute that the Silver Pool operated as a Ponzi scheme. As a matter of law, "the mere existence of a Ponzi scheme is sufficient to establish [the] actual intent to defraud" for purposes of the Act. See Klein v. Nelson, No. 2:13-cv-497-TC, 2015 WL 4545748, at *2 (D. Utah July 28, 2015). Because the Silver Pool operated as Ponzi scheme, all transfers to Ms. Brimley were presumptively fraudulent and the burden is upon Ms. Brimley to show that such transfers were received in good faith and in exchange for reasonably equivalent value. See Klein v. King & King & Jones, P.C., No. 2:12-CV-00051, 2013 WL 4498831, at *2 (D. Utah Aug. 19, 2013). "Good faith and reasonably equivalent value are independent components of this affirmative defense, and the burden is upon the Defendant to establish both the element of goof faith and the element of value." Id.

Ms. Brimley has demonstrated that she received transfers from the Silver Pool in good faith, and the Receiver does not dispute her good faith. The court has no doubt that, had Ms. Brimley known about the true nature of the Silver Pool, she would have negotiated a different divorce settlement and would not have accepted disbursements from the Silver Pool.

But Ms. Brimley's good faith cannot preclude summary judgment because Ms. Brimley fails to establish the second element: that the transfers were exchanged for reasonably equivalent value. It is axiomatic "that an investor in a Ponzi scheme does not exchange reasonably

11

equivalent value for payments which exceed the investor's investments." Miller v. Wulf, 84 F. Supp. 3d 1266, 1274 (D. Utah 2015). Consequently, because the Silver Pool has been established as a Ponzi scheme, the disbursements Ms. Brimley received were not exchanged for reasonably equivalent value. Ms. Brimley provides no facts to the contrary.

The only remaining question is whether the Ms. Brimley received amounts in excess of the initial investment. Ms. Brimley received $5,000 from the Silver Pool before her divorce from Mr. Brimley and an additional $78,850 following the divorce. At the time of the Brimleys' divorce, the remaining principal balance of the Brimley's RRC account was $25,000. After crediting Ms. Brimley with that $25,000, the amount Ms. Brimley received in excess of her contributions to the Silver Pool is $53,850. As a result, the Receiver is entitled to disgorgement in the amount of $53,850.

Ms. Brimley tries to frame the Receiver's motion for summary judgment as a collateral attack on the Brimley's divorce decree, a state court judgment. According to Ms. Brimley, the Brimley's equitable division of property at divorce was based on her understanding of the nature of the RRC investment account, which she believed held significant profits.

Ms. Brimley's argument is unsupported. First, Receiver does not seek to amend or alter the divorce decree. Indeed, the Receiver's calculations track the division of property set forth by that decree. Second, it would be inequitable to allow Ms. Brimley to retain amounts in excess of her contributions to the Silver Pool—specifically, what she thought was in the RRC investment account at the time of her divorce—when those funds were ultimately taken from other defrauded investors. To the extent that the court in the Brimleys' divorce proceeding agreed to a property division based on a mutual mistake, that court retains the power to alter or amend that property division as equity requires. See Chandler v. West, 610 P.2d 1299, 1300 (Utah 1980).

## ORDER

For the reasons described, the Receiver's Motion for Summary Judgment (ECF No. 15) is GRANTED. The Court finds and orders as follows:

1. The Silver Pool operated by Receivership Defendants was a Ponzi scheme since at least 2008;

2. Kara Brimley received $53,850 in disbursements from the Silver Pool in excess of her contributions; and

3. The Receiver is entitled to judgment in his favor against Ms. Brimley in the amount of $53,850.

Dated this 14th day of April, 2021.

                                                        **BY THE COURT:**

                                                        *Tena Campbell*
                                                        Hon. Tena Campbell
                                                        United States District Judge